UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CRIMINAL ACTION NO.  3:13CR-121-JHM
                     3:13CR-122-JHM

UNITED STATES OF AMERICA                                              PLAINTIFF

VS.

PHILLIP WALKER                                                        DEFENDANT

**MEMEMORANDUM OPINION AND ORDER**

This matter is before the Court on the objections of Defendant, Phillip Walker, to the Presentence Investigation Report prepared by the United States Probation Office. A sentencing hearing was held in this matter on June 3, 2014. Defendant Walker raised several objections regarding the calculation of his sentencing guidelines by the United States Probation Office for the counterfeit check and fraud offenses. Specifically, Walker objects (1) to his classification as a leader and organizer; (2) to the amount of loss attributable to him; (3) to the number of victims alleged in the case; (4) to the manner in which the identities were obtained as being authorized; and (5) to the calculation of Walker's criminal history. The parties filed post-hearing briefs. The United States concedes that conflicting evidence exists regarding the enhancement under U.S.S.G. § 2B1.1(11)(C)(i) for obtaining other means of identification and, therefore, concedes this two-level enhancement. The remaining matters are now ripe for decision.

**I.  STANDARD OF REVIEW**

Federal Rule of Criminal Procedure 32(i)(3)(B) provides that at sentencing, the court, "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing [.]" Fed. R. Crim. P.

32(i)(3)(B). "[I]n determining whether there is sufficient evidence to apply a relevant but disputed sentencing factor (such as a special offense characteristic), a court may rely on evidence that might be inadmissible in another procedural setting—evidence such as victim impact statements, documents, and the summary testimony of law enforcement agents." United States v. Bolze, 2010 WL 2927418, *3 (E.D. Tenn. July 23, 2010). "In addition, factors relevant to sentencing must only be proved by a preponderance of the evidence." Id. (citing United States v. Stout, 599 F.3d 549, 558 (6th Cir. 2010)).

In accordance with this authority, the Court now addresses the objections.

## II. DISCUSSION

### A. Leader and Organizer

The Guidelines provide for a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1 (a). To qualify for the enhancement, a defendant must have been the organizer or leader of only one of the five or more participants in the criminal activity. U.S.S.G. § 3B1.1(a), cmt. n.2; see also United States v. Baker, 559 F.3d 443, 449 (6th Cir. 2009) (enhancement requires only that defendant supervised or managed "*one* of the five or more other participants" (quoting United States v. Robinson, 503 F.3d 522, 529 (6th Cir. 2007))). Application note 4 provides that "[f]actors the court should consider [in determining if a defendant is an organizer or a leader] include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, cmt. n.4. Application note 4 also makes clear

2

that there can "be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." Id. United States v. Dalton, 2014 WL 3719103, *10 (6th Cir. July 28, 2014).

First, the conspiracy involved five or more participants. "Participants include those persons "who were (i) aware of the criminal objective, and (ii) knowingly offered their assistance." Robinson, 503 F.3d at 529 (citing United States v. Anthony, 280 F.3d 694, 698 (6th Cir.2002)). Walker admitted in the plea agreement to the involvement of least 12 co-conspirators in the passing of counterfeit checks at businesses and financial institutions in Jefferson County and the surrounding area.

Second, the record supports that Walker was an organizer or leader of the conspiracy. Walker not only admitted in the plea agreement that he manufactured counterfeit checks, he also admitted that he recruited at least 12 co-conspirators to pass the counterfeit checks, split the proceeds of the checks with the co-conspirators, and caused April Clifford to open bank accounts at two banks for the purpose of negotiating counterfeit checks. Further, the record reflects that Walker had access to the equipment used to produce the counterfeit checks, law enforcement observed Walker at the residence where the counterfeit checks were generated, the computer equipment contained Walker's personal information and photographs along with a check-making program and dozens of images of checks, he admitted to manufacturing some of the counterfeit checks in question, and he was arrested with some of the checks in his possession. This evidence, along with Walker's admissions, qualify him as an "organizer or leader" for the purposes of a U.S.S.G. § 3B1.1 enhancement. Moreover, whether Walker's role in the scheme was equal to the identified mid-level co-conspirators is irrelevant, as the application notes to §

3B1.1 clearly provide that "[t]here can . . . be more than one person who qualifies as a leader or organizer." U.S.S.G. § 3B1.1 cmt. n. 4.

Further, Louisville Metro Police Detective Brian Roggenkamp testified that Walker's co-conspirators, including April Clifford, indicated that he gave them instructions regarding when checks were ready, where to cash the checks, and shared in the proceeds of the counterfeit check operation. Even if the Court were to discount the testimony of many of the other co-conspirators who were interviewed by Detective Roggenkamp, April Clifford's representations, coupled with Walker's admissions with respect to his contact with her, support the Court's finding that Walker was an organizer or leader. Finally, Defendant argues that the events outlined at the hearing do not even preclude the likelihood that Jermaine Martin manufactured the checks on the day of Walker's arrest. However, Walker's plea agreement precludes such an argument by Defendant. Walker admitted to *making* and possessing the counterfeit checks with Crown Services as the payor seized at his arrest on August 15, 2014.

Accordingly, the Court finds that the evidence is more than sufficient to identify Walker as one of the leaders or organizers in the counterfeit check scheme under the preponderance of evidence standard. Thus, the Court will overrule the Defendant's objection to the four-level sentencing enhancement pursuant to U.S.S.G. § 3B1.1.

### B. Amount of Loss

U.S.S.G. § 2B1.1(b)(1)(G) increases the base offense level by 12 if the loss was greater than $200,000 and less than $400,000. "[L]oss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1) cmt. n.3(A). Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." Id. at n.3(A)(i). Intended loss is "the pecuniary harm that was intended to result from the offense," even if that loss "would have been impossible

or unlikely to occur." Id. at n.3(A)(ii). See United States v. Ware, 334 Fed. Appx. 49, 50 (8th Cir. 2009).

In considering the amount of loss, the calculation of intended loss includes "the value of the cashed and uncashed checks." Ware, 334 Fed. Appx. at 50. While the factual basis in the plea agreement provides in part that "Phillip Walker manufactured approximately 300 counterfeit checks totaling over $200,000," the parties agreed at the change of plea hearing that a dispute existed regarding the amount of loss, including the $200,000 figure set forth in the factual basis.

The United States contends that the total value of the intended loss is $211,122.92. Through the testimony of Detective Roggenkamp, the United States introduced a summary chart detailing his view regarding the checks that were cashed or attempted to be cash and the dollar-amount of those checks. According to the United States, the total amount of loss sustained by the victims of the conspiracy was $192,915.40. The remaining $18,207 is from counterfeit checks found in Walker's possession at the time of his arrest and checks found in the possession of a co-conspirator upon arrest. According to the United States, the summary chart prepared by Detective Roggenkamp includes all checks associated with the conspiracy, including checks payable to common payees, written on common businesses, written on common bank accounts, and related to the forensic exam of Walker's computer.

Walker objects to the 12-level enhancement under U.S.S.G. § 2B1.1(b)(1)(G) arguing that the United States failed to prove by a preponderance of the evidence that he caused losses in excess of $200,000. Walker contends that he generated far fewer than 300 checks and the amount of loss was less than $70,000. According to Walker, merely because Detective

Roggenkamp chose to include a check among the roughly 360 checks on the chart is not proof that a particular check is connected to Walker.

After a review of Detective Roggenkamp's testimony at the sentencing hearing and all of the United States' exhibits, the Court finds by a preponderance of the evidence that the conspiracy to produce and cash counterfeit, commercial checks involved over twenty-five individuals during a two year period between 2011 and 2013. The evidence indicates that over 300 checks were manufactured and cashed or attempted to be cash during this period of time. Further, the Court finds the amount of intended loss is $ 192,559.66. With exception of the specific checks discussed below, the Court finds by a preponderance of the evidence that the checks set forth in Government's Exhibit 2 are sufficiently linked to the conspiracy to include them in the calculation of intended loss. Significantly, the chart reflects that the majority of counterfeit checks written on a specific company's account have similar check numbers. For example, 18 of the Louisville Country Club checks contain check numbers ranging from check number 32019 to check number 32068. Similarly, JCPS checks contain check numbers ranging from 287901 to 287938. Additionally, for each of these companies, one or more of the co-conspirators or recruits are recorded as having cashed one or more of the checks in question. In fact, for at least 24 of the checks, Defendant Walker has pled guilty to having "made and possessed" or "made and attempted to pass" the counterfeit checks in question.

With respect to the Tumbleweed check made payable to Asa Gathright in the amount of $434.57, the check number does not match the other check numbers that were drawn on the Tumbleweed account. Additionally, the Court has not been provided a copy of the check to compare to the other checks in question.

With respect to the Louisville Country Club checks made payable to Carla Marks and Arika Sullivan in the amount of $329.68 and $375.23, the Court finds the check numbers do not match the check numbers consistently used on the other checks drawn on that account. Additionally, there is no indication who cashed those checks, and the Court has not been provided copies of the checks to compare to each other.

With respect to the Commonwealth of Kentucky check made payable to Sarah Toombs in the amount of $385.00, the Court finds that the connection of this check to the conspiracy is too attenuated. No other check lists only the Commonwealth of Kentucky as the payor. Additionally, while Sarah Toombs is an admitted name used by one of the co-conspirators, there is no indication in Government Exhibit 2 that April Clifford cashed the check on that particular day. Absent any similar checks or evidence that April Clifford actually cashed the check, the Court did not consider this check in calculating the intended loss.

With respect to the Kentucky Department of Treasury check made payable to Shawn Stevenson in the amount of $1,192.00, the Court finds the check number for this check does not match the check numbers consistently used on the other checks drawn on that account. There is no indication who cashed the check, and the Court has not been provided a copy of this check to compare to the remaining checks. Additionally, the name Shawn Stevenson does not appear anywhere else in Government Exhibit 2.

With respect to the Amedisys Home Healthcare checks made payable to Carl Turner and Kenneth Leda in the amount of $347.05, $387.05, and $387.05, the Court finds that the United States has not satisfied its burden with respect to these three checks. Neither Carl Turner nor Kenneth Leda has been specifically linked to the conspiracy. Additionally, the record does not reflect who cashed the checks in question. Further, while the Court included three Sonic checks

7

made payable to Carl Turner in the amount of intended loss, the Court finds that the Sonic check number similarities and the Defendant's admission that he made and possessed Sonic check number 20338 satisfy the preponderance of the evidence standard with respect to the Sonic checks.

With respect to the Securus checks made payable to Amy Hoage and Jennifer Scott in the amount of $464.15, $437.89, $461.94, the Court finds that the link of these checks and individuals to the conspiracy is not sufficient to sustain the United States' burden of proof. While Detective Roggenkamp testified that Leeann Rager used the names Amy Hoage and Jennifer Scott during the conspiracy, there is no indication in Government Exhibit 2 that Leeann Rager cashed any of the checks made payable to Amy Hoage or Jennifer Scott. The Court is aware that Jennifer Scott's name appears two additional times in the chart as a payee of Foodservice Management checks. The Court included those two Foodservice Management checks in the amount of intended lost given Defendant Walker's admission that he used Christopher Cameron to cash checks for him, Christopher Cameron's connection to the Foodservice Management checks, and the similar check numbers of the Foodservice Management checks.

With respect to all of the checks written on the account of BVI Double Drive-Thru (Rally's) in the amount of $13,361.65, the Court finds their link to the conspiracy too attenuated. The only link the Court can ascertain from the evidence is the presence of Barbara Eversole and Amy Hoage as the payees of the checks. As discussed above, while Detective Roggenkamp testified that Leeann Rager used the name Amy Hoage during the conspiracy, there is no indication in Government Exhibit 2 that Leeann Rager cashed any of the checks made payable to Amy Hoage. Additionally, only one other check made payable to Barbara Eversole on the University of Louisville Hospital account is contained in Exhibit 2. Because of the similarity in

8

check numbers of the University of Louisville Hospital checks and the connection of Christopher Cameron with Defendant Walker, the Court permits the inclusion of the University of Louisville Hospital check.

Accordingly, the Court will grant in part the Defendant's objection to the 12-level sentencing enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(G). Having concluded by a preponderance of the evidence that the amount of intended loss is $ 192,559.66, the Court increases the base offense level by 10 because the loss was greater than $120,000 and less than $200,000 pursuant to U.S.S.G. § 2B1.1(b)(1)(F).

### C. Number of Victims

The United States argues that Walker qualifies for the four-level enhancement for an offense involving 50 or more victims. U.S.S.G. § 2B1.1(b)(2)(B). The United States identifies 46 businesses at which the checks were cashed. Further, the United States maintains that the 15 individuals whose identities were unlawfully used to cash counterfeit checks should be added to the total number of victims pursuant to U.S.S.G. § 2B1.1 cmt. n.4(E). Walker objects to the four-level enhancement in this case.

First, the Court finds that the 46 businesses that cashed the checks in question suffered loss as a result of the conspiracy in question. Contrary to Walker's argument, the identified businesses cashed one or more checks that the Court included in the intended loss calculation and thus, qualify as a victim. In as much as the United States argues that the unidentified businesses that cashed checks should be considered victims, the Court finds that they are not properly included in the number of victims. These checks could have been cashed by established victims in this case, such as Walmart or ValuMarket. The United States has not proven by a

preponderance of the evidence that these unidentified businesses should be included in the number of victims.

Second, the Court finds that the United States has not established by a preponderance of the evidence that the 15 individuals whose identities were used to cash the counterfeit checks qualify as victims. Detective Roggenkamp testified that 6 of the 15 identities, including Lancaster, Street, Monroe, Turpin, and Hoage, were reported as stolen or lost and therefore should at least be included in the calculation of number of victims. Under Application Note 1, "victim" is defined as "any person who sustained any part of the actual loss determined under" § 2B1.1(b)(1). U.S.S.G. § 2B1.1 app. n.1(A). No indication exists that any of these individuals suffered any actual loss. Therefore, the United States failed to establish by a preponderance of the evidence that these individuals qualify as victims under Application Note 1.

Under Application Note 4(E) of the Guidelines which was amended in 2009, a "victim" now includes "any individual whose means of identification was used unlawfully or without authority." U.S.S.G. § 2B1.1 cmt. n.4(E)(ii). Application Note 4(E) specifically states that this definition of victim exists independently from the general definition of victim in Application Note 1, which requires "actual loss" or "bodily injury." USSG § 2B1.1 cmt. n.1. See United States v. Melchor, 2014 WL 3746998, *1 (4th Cir. July 31, 2014). While recognizing that no reported cases have addressed this issue, the United States contends that because the identities were used "unlawfully" to negotiate counterfeit checks, these individuals should all be included as victims even if they acquiesced in the use of their identities.

In the present case, with the exception of Ashton Turpin, none of the individuals the United States seeks to include as a victim came forward to report that their identification had been lost or stolen. Only upon being contacted by law enforcement and questioned about their

potential involvement in the counterfeiting operation did the individuals indicate that their identification had been lost or stolen. Additionally, contrary to the representation of Ashton Turpin, April Clifford informed Detective Roggenkamp that she bought some of the identifications in question, including Turpin's identification. Thus, given the conflicting testimony received by Detective Roggenkamp, coupled with the lack of any additional evidence presented at the hearing regarding these individuals, the record does not support by a preponderance of the evidence that these individuals had their identities stolen.

Furthermore, in light of the history surrounding the 2009 amendment, it is difficult for the Court to believe that individuals who acquiesced or conspired in the counterfeit check scheme could be considered a victim in calculating total number of victims. Significantly, in explaining the 2009 amendment, the Commission noted that this amendment to the definition of victim was adopted to recognize that identity theft victims "even if fully reimbursed, must often spend significant time resolving credit problems and related issues, and such lost time may not be adequately accounted for in the loss calculations under the guidelines." U.S.S.G. § 2B1.1, historical note (2009). Individuals who sold or gave their identities to Walker or other co-conspirators were not victims of identity theft.

For these reasons, the Court finds that the United States did not carry its burden of proof with respect to whether these individuals qualify as victims under Application Note 4. Accordingly, Defendant's objection to the U.S.S.G. § 2B1.1(b)(2)(B) four-level enhancement for the number of victims of 50 or more is sustained. Instead, the Court shall apply a two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A) for the number of victims of 10 or more.

**D. Criminal History**

The Presentence Investigation Report calculates Walker's criminal history as category

VI. In his original sentencing memorandum, Defendant objects to two sections of the criminal history calculation. Defendant argues that his criminal history should be correctly calculated at criminal history category V. Defendant maintains that he should receive only one point for his 10/28/2005 conviction listed in the initial Presentence Investigation Report at ¶ 77 and in the February 20, 2014 Presentence Report as ¶ 76. Defendant represents that he served about two weeks in jail for that charge, followed by home detention. Defendant further contends that regarding the possession of marijuana charge listed in ¶ 80 and ¶ 83 of the initial Presentence Investigation Report (¶ 79 and ¶ 82 of the February 20, 2014 PSR), he was unrepresented and there is no indication that his waiver was knowingly made. Finally, Defendant argues that a downward departure under U.S.S.G. § 4A1.3(b) is warranted because Walker's criminal history category of six substantially over represents the seriousness of his criminal history.

In its post-sentencing hearing response, the United States notes that the Probation Office's records indicate that Walker served one year, two months, and fourteen days in custody for the 10/28/2005 conviction. The United States concedes that the reasons for these calculations must be stated on the record and suggests that such testimony take place at the next sentencing hearing. Defendant did not discuss this issue in its post-sentencing hearing brief.

For these reasons, the Court will address this objection at the next sentencing hearing.

### III. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the Defendant's objections with respect to the sentencing enhancements are **granted in part and denied in part**. The adjusted offense level for Group 1 (counterfeit check and bank fraud offenses) is 23 and the adjusted offense level for Group 2 (firearm offense) is 20. Applying U.S.S.G. § 3D1.4, two

levels are added for two units bringing the combined adjusted offense level to 25 and the total offense level, after reduction for acceptance of responsibility, to 22.

The Defendant's criminal history will be addressed at the next sentencing hearing. If it is determined that the Defendant is a criminal history category VI, the sentencing guidelines range for Walker is 84 to 105 months. If it is determined that the Defendant is a criminal history category V, the sentencing guidelines range for Walker is 77 to 96 months.

cc: counsel of record
    U.S. Probation

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

September 9, 2014